Filed 7/31/13  P. v. Hamilton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ALONZO HAMILTON,<br><br>        Defendant and Appellant. | C068430<br><br>(Super. Ct. No. 09F01253) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>HOLLIE GARRETT,<br><br>        Defendant and Appellant. | C069220<br><br>(Super. Ct. Nos.<br>09F01253 & 10F03051) |

        Following a joint trial, a jury found defendants Alonzo Hamilton and Hollie Garrett each guilty of one count of forcible oral copulation of 14-year-old C.G.

1

(Pen. Code,[1] § 288a, subd. (c)(2)(A); count one), and four counts of forcible oral copulation of C.G. in concert with another (*id.*, subd. (d)(1); counts two through five). The trial court sentenced Hamilton to an aggregate term of 34 years in state prison, consisting of 6 years (the middle term) on count one, and a full consecutive 7 years (the middle term) on each of the remaining counts (§ 667.6, subd. (d)). The court sentenced Garrett to an aggregate term of 20 years in state prison, consisting of 6 years on count one, and a full consecutive 7 years on counts three and four. The trial court stayed Garrett's sentence on count two pursuant to section 654, and count five was dismissed on the prosecutor's motion.

Defendants filed separate appeals, which we consolidated for purposes of oral argument and disposition. Hamilton contends (1) the trial court abused its discretion in admitting evidence C.G. was forced to orally copulate four, as opposed to three, men; (2) there is insufficient evidence to support two of his four convictions for forcible oral copulation in concert; (3) the trial court erred in failing to instruct the jury sua sponte on battery, assault, and attempt as lesser included offenses of forcible oral copulation in concert; and (4) his conviction for forcible oral copulation must be reversed because it is a necessarily included offense of forcible oral copulation in concert. We shall conclude that the challenged evidence properly was admitted because it falls within the prior inconsistent statement exception to the hearsay rule. (Evid. Code, § 1235.) We shall further conclude that Hamilton's convictions are supported by sufficient evidence, and that forcible oral copulation is not a lesser included offense of forcible oral copulation in concert, but that Hamilton's sentence on one count (forcible oral copulation) must be stayed pursuant to section 654. Finally, we shall reject Hamilton's assertion that the trial court erred in failing to instruct the jury on assault, battery, and attempt as lesser included

---

[1] Further undesignated statutory references are to the Penal Code.

2

offenses of forcible oral copulation in concert because there is no evidence that the offenses committed by Hamilton were less than those charged. Accordingly, we shall stay Hamilton's sentence on count one (forcible oral copulation) and affirm the judgment against him in all other respects.

Garrett contends (1) none of his convictions are supported by substantial evidence; (2) the judgment must be reversed to remedy the jury's exposure to evidence C.G. offered to take a polygraph test; (3) the trial court erred in instructing the jury in the language of CALCRIM No. 400 (Aiding and Abetting: General Principles); (4) the prosecutor committed misconduct by advising the jury that an aider and abettor is "just as guilty as" the perpetrator; (5) his convictions must be reversed because the DNA evidence upon which they are based is unreliable; and (6) his trial counsel was ineffective in failing to move for a separate trial or separate jury. We shall conclude that each of Garrett's convictions is supported by substantial evidence; Garrett forfeited his challenge to the introduction of evidence that C.G. offered to take a polygraph test by failing to object at trial, and in any event, the admission of such evidence is harmless; the trial court properly instructed the jury on aider and abettor liability; the prosecutor did not commit misconduct; the DNA evidence against Garrett was reliable; and Garrett failed to meet his burden of establishing his trial counsel was ineffective. Accordingly, we shall affirm the judgment against him in its entirety.

FACTUAL AND PROCEDURAL BACKGROUND

In mid-July 2000, 14-year-old C.G. went to the movies with her boyfriend Cameo, a guy named "Chris," and her neighbor. During the movie, C.G. orally copulated Cameo. A couple of days later, on the evening of July 18, Chris showed up at C.G.'s mother's apartment and invited C.G. to watch a movie at his grandmother's home. As C.G. walked to the car with Chris, she noticed there was another person inside the car. Once inside the car, she saw Chris wave to two occupants of another car, who then followed them to a nearby park. When they arrived, C.G. asked Chris why they were at the park

3

and not at his grandmother's house, and he told her not to worry, and that they would go to his grandmother's later. C.G. and the four men sat at a table in front of the restroom. All of the men were African-American and were in their late teens or early twenties.

While they were sitting at the table, Chris told C.G. that he needed to talk to her, took her by the wrist, and led her into the restroom. Once inside, Chris stood in front of the door, pulled his pants down, pushed C.G. down, and inserted his penis in her mouth. She slapped his legs and attempted to stand up, but he "kept pushing it." At that point, she "started getting scared because in the bathroom it was real dark." After several minutes, one of the three other men from the table entered the restroom. She could not recall which one.

The second man pulled out his penis and began to "play" with himself. At that point, Chris and the second man "were over [C.G.] with their penises out." At some point Chris ejaculated, moved to the side, and the second man placed his penis in C.G.'s mouth. C.G. did not feel free to leave because Chris and the second man were holding her. She attempted to resist the second man, but he and Chris laughed and made derogatory comments directed at her. As C.G. was being forced to orally copulate the second man, Chris left for a while. C.G. was not sure whether the second man ejaculated.

When Chris returned, the other two men from the table were with him. At that point, there were "four people surrounding" C.G. in the restroom. She was scared. She tried to leave, but they would not let her. She did not know what they were going to do, so she just complied. A third man put his penis in her mouth while the other men laughed. She attempted to push the third man away. One of the men stopped after she slapped at his legs, but she could not recall which one. At trial, C.G. testified that she was sure she was forced to orally copulate three of the men but was unsure whether she was forced to orally copulate the fourth.

When the men finished forcing C.G. to orally copulate them, all four men stood over her and masturbated as she squatted down on the floor, and at least three of them

4

ejaculated on her. At some point, Chris told the other men, "Her mom's on us. So we got to be cool," or something like that.

When the men were through, they allowed C.G. to leave the restroom. When she left, she rolled around on the grass in an attempt to get the semen off her clothes and hair. The men left in their respective cars. As they drove away one man shouted, "[T]hat's what you get for being so trusting, bitch," and another flipped her off. C.G. estimated that she was in the restroom for about an hour.

After rolling in the grass, C.G. began walking to her mother's apartment. On the way, she ran into a man who asked her if she was okay, and when she responded that she was not, he drove her home. When C.G. returned home, her hair and clothing were "all messed up" and she was crying. She told her mother she had been "violated," and that "they" had taken her to a park, drug her into a restroom, and "performed sexual acts on her." Her mother summoned the police and C.G.'s brother's girlfriend. The girlfriend arrived about five minutes later, before the police. C.G. was distraught and crying. C.G. told the girlfriend that she was in the restroom with some boys, and they made her perform oral sex on them.

Sacramento Police Officer Darrel Johnson was dispatched to C.G.'s mother's apartment at 9:40 p.m. When he arrived, C.G. was sitting on the floor with her hands covering her face and crying. She had scratches on her shoulder and white stains on the right thigh and left knee areas of her pants. C.G. told Johnson that she had gone to a park with "Chris, and another suspect who met up with another group of male blacks in another car," and she was forced to orally copulate "[a]ll four suspects." She also told him "that two of the suspects began rubbing their penises in their hands and ejaculated on her." Johnson transported C.G. to U.C. Davis Medical Center for an evidentiary exam.

C.G. arrived in the emergency department at 11:00 p.m. and was examined for approximately two and one-half hours by Sheridan Miyamoto, a nurse practitioner with the Child and Adolescent Resource and Evaluation Diagnostic and Treatment Center.

5

When Miyamoto asked her what had happened, C.G. stated that "she had gone to the park with a male she called Chris and some of his friends, and . . . he had taken her into a bathroom and forced oral copulation on her. Then his friends came in and all of them forced oral copulation on [her]." C.G. also told Miyamoto that there were four men in the bathroom and that "all four of them began oral copulation and two actually stopped once she struck out at them and hit them." When taking notes during her examination, Miyamoto detailed the perpetrators by number so she could keep them straight. C.G. told Miyamoto that "number one and number two ejaculated and wouldn't stop despite [C.G.'s] protests. Number three and number four began to do oral copulation but stopped when [C.G.] hit them." She further indicated that three of the four men "ejaculated on to her body" after masturbating. Miyamoto collected C.G.'s clothing and scanned her body with a black light, looking for "any kind of a dried secretion on her skin." Miyamoto took samples of the dried secretions found on C.G.'s skin and cuttings from her hair. Miyamoto also collected C.G.'s clothing, placing each piece in a separate bag. The samples and the clothing then were sent to the Sacramento County crime lab.

Initially, the police were unable to identify any of the men, and C.G. "gave up" and attempted to block the incident from her mind. Eight years later, in 2008, she was contacted by Retired Reserve Officer Peter Willover, who works "cold" cases for the Sacramento Police Department. Willover advised C.G. that there had been a DNA "match" as to one of the men who assaulted her but did not tell her the individual's name. He asked her to look at a photographic lineup, and when she did so, she pointed to Hamilton. She told Willover, "I know this guy, but it's not [from] that. The guy, Chris, looks similar to him." C.G. later explained that her cousin had introduced her to Hamilton in 2004 or 2005, the two became friends and were intimate a couple of times. At no point during the time she was intimate with Hamilton did she think he was the person she knew as "Chris" from the park. She cried when she learned that the DNA found on her following the incident was a match for Hamilton and said she could not

6

believe that Chris and Hamilton was the same person.  At trial, C.G. identified Hamilton as the person she formerly knew as "Chris."

Officer Willover interviewed Hamilton on November 6, 2008, while Hamilton was in custody at Rio Consumnes Correctional Center.  Willover explained that he worked cold cases and that Hamilton's name "ha[d] come up as a suspect in a sexual assault that occurred back in 2000, involving a 14-year-old girl in a park rest room at Wood Park on Bodine Circle."  Willover also showed Hamilton a photograph of the victim, whom Hamilton immediately recognized as C.G.  Hamilton said he did not "recall any of that happening" but that he did recall "getting with" C.G. within the last year.  He denied ever "raping" or "sexually assaulting" C.G. and stated that "[e]ight years ago I didn't even talk to [C.G.]."  He denied ever having sex with C.G. in a park restroom and did not recall ever having sex with her when she was 14.  He told Willover he "never forced that girl to do a damn thing" and that she is a "fucking liar."  He also stated that "if it did happen, it happened, and she did it willingly."  Finally, he denied ever going by the name "Chris."

Following the interview, Hamilton telephoned his "baby momma" Jasmine and told her that earlier that morning the police told him "this bitch [C.G.] said I raped her" and that it was "eight years ago" with "three other guys."  Hamilton also said that he did not "remember dealing with [C.G.] in no . . . 2000 period."  During the conversation, Hamilton and Jasmine repeatedly referred to C.G. as a "bitch," and Jasmine said she wanted to kill C.G.  After a while, Jasmine telephoned C.G., and Jasmine, C.G., and Hamilton engaged in a three-way conversation.  Hamilton asked C.G. if he raped her eight years earlier, and C.G. responded, "You didn't rape me."  C.G. told Hamilton that he and "three other dudes took me to that park, and you all had me give you ass and then you all left me up there."  Hamilton responded, "I don't even remember that bro."  C.G. explained, "I didn't know you.  I knew you as Chris like but I didn't [put] those two together."  Hamilton insisted he did not remember the incident in the restroom, and C.G. explained that "two days before we had went to the movie" with Cameo and C.G.'s

7

neighbor.  C.G. told Hamilton, "I don't know how you couldn't remember it's you and three other dudes.  [¶] . . . [¶]  It done messed me up share."  Hamilton asked C.G. if they had been drunk" because he did not remember any such incident.  Hamilton said that he remembered the movie with Cameo, but "that's the only thing I remember.  I swear to God.  So I'm like, was we drunk?"  He also asked C.G. if he forced her to do anything, and she responded that she "did not want to do that."  Eventually, Jasmine hung up on C.G., reminding Hamilton that his lawyer had told him not to talk to anyone.

In March 2010, Officer Willover received information that there had been a second DNA "hit" from the evidence collected from C.G. in 2000.  He was informed that the DNA was a match for Garrett.  Prior to that time, Garrett's name had never come up in Johnson's investigation.  C.G. did not recognize Garrett from the incident or anywhere else.

Hamilton's DNA profile was found in samples taken from C.G.'s hair, tank top, and jeans.  Garrett's DNA profile was found in samples taken from C.G.'s tank top, left arm, back, and jeans.  DNA from a third unidentified male was also found.  Hamilton's DNA profile is estimated to occur at random among unrelated individuals in approximately one in two quintillion of the African-American population, one in three sextillion of the Caucasian population, and one in eleven sextillion of the Hispanic population.  Garrett's DNA profile is estimated to occur at random among unrelated individuals in approximately one in one sextillion of the African-American population, one in a hundred sextillion of the Caucasian population, and one in two hundred and seventy sextillion of the Hispanic population.

DISCUSSION

I

C.G.'s Out of Court Statements Concerning the Number of Men She Was Forced to Orally Copulate Were Properly Admitted Under the Prior Inconsistent Statement Exception to the Hearsay Rule

Hamilton first contends that the trial court erred in allowing the prosecution "to rely on hearsay reports allegedly made by [C.G.] to a law enforcement officer [(Johnson)] and a forensic examiner [(Miyamoto)] to prove that four acts of oral copulation occurred, rather than three as testified to by [C.G.] in her sworn testimony at trial." As we shall explain, the trial court did not err by admitting the challenged statements because they fall within the prior inconsistent statement exception to the hearsay rule. (Evid. Code, § 1235.)

The prosecution moved in limine to introduce C.G.'s statements to her mother, her brother's girlfriend, Johnson, and Miyamoto under the fresh complaint doctrine. Under that doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose--namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others . . . ." (*People v. Brown* (1994) 8 Cal.4th 746, 750-751.) Evidence admitted under the fresh complaint doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. (*People v. Bernstein* (1959) 171 Cal.App.2d 279, 285.)

The trial court indicated that C.G.'s statements, minus the details, were admissible under the fresh complaint doctrine. The court also observed that C.G.'s statements to her mother were admissible under the spontaneous statement exception to the hearsay rule (Evid. Code, § 1240), and that her statements to Officer Johnson "probably" were admissible on the same basis. Hamilton's trial counsel objected to the admission of C.G.'s statements as spontaneous statements, arguing that C.G. had time to reflect before

9

going home and reporting the incident. The trial court overruled Hamilton's objection, at least as to C.G.'s statements to her mother, describing the issue as "a slam dunk" and advising Hamilton's trial counsel that his arguments were not "even in the ball park . . . ."

At trial, C.G. testified to a total of three acts of oral copulation. When specifically asked whether she was forced to orally copulate all four men, she responded, "I remember three for sure. [¶] . . . [¶] . . . There's one I'm unsure." The only evidence that C.G. was forced to orally copulate all four men came from Johnson and Miyamoto, both of whom testified that C.G. told them that she was forced to orally copulate all four men.

As a preliminary matter, the People assert that Hamilton forfeited his argument concerning the admissibility of the challenged evidence by failing to "object at the time the testimony was given" or "press for a ruling when the prosecutor's motion was heard in limine." Hamilton responds that any further objection or renewal of his prior objections would have been futile given the trial court's remarks, and defense counsel is not required to make a futile objection to preserve an issue for appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) The trial court clearly ruled that C.G.'s statements to her mother were admissible under the spontaneous statement exception to the hearsay rule. It is less clear, however, whether the trial court's ruling extended to C.G.'s statements to Johnson or Miyamoto. Even assuming arguendo that the ruling did extend to those statements and that Hamilton preserved the issue on appeal, his assertion that the trial court erred in admitting the statements fails on the merits.

Although Hamilton challenges the grounds for admission--the fresh complaint doctrine and the spontaneous statement exception to the hearsay rule-- "[w]e review judicial action and not judicial reasoning." (*People v. Franklin* (2003) 105 Cal.App.4th 532, 535.) Thus, our focus is on whether the evidence was admissible on *any* ground, not whether it was admissible on the particular basis articulated by the trial court. (*Wilcox v. Berry* (1948) 32 Cal.2d 189, 192.) As we shall explain, C.G.'s statements to Johnson and

10

Miyamoto concerning the number of men she was forced to orally copulate were admissible under the prior inconsistent statements exception to the hearsay rule.

" ' "A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770." [Citation.] "The 'fundamental requirement' of section 1235 is that the statement in fact be inconsistent with the witness's trial testimony." [Citation.] " 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . .' " [Citation.]' [Citation.]"[2] (*People v. Homick* (2012) 55 Cal.4th 816, 859, fn. omitted; see also *People v. Hovarter* (2008) 44 Cal.4th 983, 1008-1009 (*Hovarter*).)

In *Hovarter,* the defendant was charged with the first degree murder, kidnapping, and forcible rape of Danna Elizabeth Walsh. (*Hovarter, supra,* 44 Cal.4th at p. 989.) Before the trial in that case, the defendant was convicted of the rape, kidnapping, and attempted murder of A.L. (*Id.* at p. 992.) At the trial involving Walsh, A.L. testified that she accepted a ride from the defendant while hitchhiking to school. Rather than take her to school, however, the defendant pulled off the highway, pushed A.L. into the sleeper compartment of his truck and told her to remove her clothes. After touching A.L.'s vagina, the defendant decided to drive somewhere safer. Around this time, the defendant told her *he knew what he was doing*. He eventually stopped the truck and raped her.

---

**2**   Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; *or* [¶] (b) The witness has not been excused from giving further testimony in the action." (Italics added.) Here, C.G. had not been excused from giving further testimony in the action. Thus, the foundation requirements of Evidence Code section 770 were met.

11

(*Id.* at p. 992.)  On cross-examination, defense counsel asked A.L. whether she remembered the defendant saying anything more than he knew what he was doing, and she said she did not.  (*Id.* at p. 1006.)  Defense counsel then asked her if she thought the comment was made in relation to " 'what he was doing in terms of raping you,' " and A.L. responded, " 'That's the idea that I got.' "  (*Id.* at p. 1007, italics omitted.)  On redirect, the prosecutor asked her whether she told a detective " 'that the man who had done these things to you told you that this was not the first time that he had done this and that he knew what to do?' "  (*Ibid.*)  A.L. responded, " 'He said that he knew what he was doing.  I remember that.  *I don't remember if he said specifically that he had done it before.*' "  (*Ibid.*)  The prosecutor then called the detective, who testified that when he interviewed A.L., she told him " 'her assailant said to her that *this was not the first time that he had done this* and that he knew what to do.' "  (*Ibid.*)  In rejecting the defendant's contention that the detective's testimony (that A.L. told him the defendant said he had done this before) should have been excluded as hearsay, the court explained:  "When she testified at trial that she did not 'remember if he said specifically that he had done it before,' a question arose whether her proclaimed lack of memory was a deliberate evasion, which could give rise to an implied inconsistency [citation], or a true case of a failed memory.  Of course, dealing with a sexual assault victim's memory of the traumatic event can be a delicate matter and one committed to the trial court's discretion. . . . [The detective's] testimony recounting A.L.'s prior statement was sufficiently inconsistent in effect to qualify as a prior inconsistent statement.  [Citation.]  'Generally it is true that the testimony of a witness indicating that he or she does not remember an event is not inconsistent with a prior statement describing the event.  [Citation.]  "But justice will not be promoted by a ritualistic invocation of this rule of evidence.  Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement [citation], and the same principle governs the case of the forgetful witness." ' [Citation.]"  (*Id.* at pp. 1008-1009.)

12

Likewise, in this case, when C.G. testified that she was not sure if she was forced to orally copulate all four men, a question arose whether her proclaimed lack of memory was a deliberate evasion, which could give rise to an implied inconsistency, or a true case of failed memory. (See *Hovarter, supra,* 44 Cal.4th at p. 1008.) Johnson's and Miyamoto's testimony recounting C.G.'s prior statements were sufficiently inconsistent in effect to qualify as prior inconsistent statements. (*Ibid.*) Accordingly, those statements were admissible both to impeach the credibility of C.G.'s contrary trial testimony and for the truth that she was forced to orally copulate all four, as opposed to just three, men.

## II

### Hamilton Was Properly Convicted of Four Counts of Forcible Oral Copulation in Concert, but His Sentence on Count One (Forcible Oral Copulation) Must Be Stayed

Hamilton contends there is insufficient evidence to support his convictions for one count of forcible oral copulation and four counts of forcible oral copulation in concert where, as here, there is evidence of four, not five, acts of oral copulation. According to Hamilton, "[a] defendant may not be convicted of both oral copulation and oral copulation in concert for [the same] act of oral copulation." Thus, he argues that absent evidence of a fifth act of oral copulation, he "could only be convicted of a maximum of one act of oral copulation as principal and [three] additional acts of oral copulation in concert."[3] As we shall explain, his convictions are proper but his sentence on count one (forcible oral copulation) must be stayed.

_____

[3] Erroneously assuming that we would conclude that evidence C.G. orally copulated four, as opposed to three, men should have been excluded, Hamilton argues that he could be convicted of a maximum of *two* additional acts of oral copulation in concert. As detailed above, evidence C.G. orally copulated all four men was properly admitted. Thus, the question is whether Hamilton could be convicted of a maximum of three additional acts of oral copulation in concert.

13

"While section 654 prohibits multiple *punishments*, it is generally permissible to *convict* a defendant of multiple charges arising from a single act or course of conduct. [Citations.] However, a 'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' [Citation.] [¶] When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed. [Citations.] If neither offense is necessarily included in the other, the defendant may be convicted of both, 'even though under section 654 he or she could not be punished for more than one offense arising from the single act or indivisible course of conduct.' [Citation.]" (*People v. Sanders* (2012) 55 Cal.4th 731, 736 (*Sanders*).)

Here, Hamilton was convicted of one count of forcible oral copulation and four counts of forcible oral copulation in concert. The evidence established that C.G. was forced to orally copulate at most four men. Thus, Hamilton necessarily was convicted of one count of forcible oral copulation and one count of forcible oral copulation in concert based on the same act of oral copulation.

" 'In deciding whether multiple conviction is proper, a court should consider only the statutory elements.' [Citation.] 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.' [Citation.] In other words, ' "[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former." ' [Citations.]" (*Sanders, supra,* 55 Cal.4th at p. 737.)

Section 288a, subdivision (d)(1) provides in pertinent part: "Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that person, commits an act of oral copulation (1) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily

injury on the victim or another person . . . shall be punished by imprisonment in the state prison for five, seven, or nine years." Section 288a, subdivision (c)(2)(A) provides: "Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years." The addition of the "acting in concert with another" language in section 288a, subdivision (d)(1) means that it is possible to violate section 288a, subdivision (c)(2)(A) without also violating section 288a, subdivision (d)(1). In other words, a defendant who, acting alone, commits an act of forcible oral copulation, would violate subdivision (c)(2)(A) but not subdivision (d)(1). Similarly, the addition of the "by aiding and abetting that other person" language in section 288a, subdivision (d)(1) means that it is possible to violate subdivision (d)(1) without necessarily violating subdivision (c)(2)(A). In other words, a defendant who voluntarily aids and abets another in committing an act of oral copulation by force would violate subdivision (d)(1) but not subdivision (c)(2)(A).[4] Thus, the elements test is not satisfied. Accordingly, Hamilton was properly convicted of all four counts of forcible oral copulation in concert, even though one of those counts necessarily was based on the same act of oral copulation as his conviction for forcible oral copulation.[5]

---

[4]  Given our conclusion, we need not consider Hamilton's contention that "his conviction on count one [(forcible oral copulation)] must be vacated because it was an offense necessarily included in one of the other counts [(forcible oral copulation in concert)] for which [he] was convicted."

[5]  The related question whether a defendant may be convicted of both oral copulation of an unconscious person and oral copulation of an intoxicated person where the defendant committed only one act of unlawful copulation is currently pending before the Supreme Court in *People v. Gonzalez* (2012) 211 Cal.App.4th 405, review granted February 27, 2013, S207830.

Hamilton, however, may not be separately punished for violations of section 288a, subdivision (c)(2)(A) and subdivision (d)(1) based on the same act of oral copulation even though multiple convictions for both offenses were proper. (*Sanders*, 55 Cal. 4th at p. 743.) Thus, the question is which of Hamilton's sentences must be stayed. As relevant, section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the *longest* potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Italics added.) The punishment for violating section 288a, subdivision (c)(2)(A) was three, six, or eight years. The punishment for violating section 288a, subdivision (d)(1) was five, seven, or nine years. Accordingly, section 288a, subdivision (d)(1) provided for the longest potential term of imprisonment. Thus, Hamilton's sentence on count one for violating section 288a, subdivision (c)(2)(A) must be stayed.

## III

### The Trial Court Did Not Err in Failing to Instruct the Jury Sua Sponte on Assault, Battery, or Attempt as Lesser Included Offenses of Forcible Oral Copulation in Concert

Hamilton next contends the trial court erred in failing to instruct the jury sua sponte on assault (§ 240), battery (§ 242), and attempt (§§ 664/288a, subd. (d)(1)) as lesser included offenses of forcible oral copulation in concert. We disagree.

" 'The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) "[E]ven on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) A trial court need not instruct on a lesser included offense "when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime

16

(for example, when the only issue at trial is the defendant's identity as the perpetrator)." (*People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5.) Stated another way, a trial court need not instruct on a lesser included offense if there is insufficient evidence that the offense committed, if any, was less than that charged. (*People v. Duncan* (1991) 53 Cal.3d 955, 970.)

The People concede that assault and battery are lesser included offenses of forcible oral copulation in concert but dispute that attempted forcible oral copulation in concert is a lesser included offense of the same. We need not decide whether attempted forcible oral copulation is a lesser included offense of forcible oral copulation in concert because there is no evidence that the offenses committed by Hamilton, if any, were less than forcible oral copulation in concert. The evidence was not equivocal as to whether Hamilton was successful in forcing C.G. to orally copulate him or in aiding and abetting the others in forcing C.G. to do the same to them such that the jury might have concluded that Hamilton's conduct amounted to assault, battery, or attempted forcible oral copulation in concert but fell short of forcible oral copulation in concert. As the People correctly observe, "The fact that [two of the four men] stopped after initially succeeding does not render the act a failed attempt." Thus, the crimes charged in counts two through five were either forcible oral copulation in concert or nothing. Accordingly, instructions on assault, battery, and attempt were not required.

IV

Garrett's Convictions Are Supported by Substantial Evidence

Garrett first contends that "there was no proof of forcible oral copulation by [him]," or that he "acted in concert with anyone to commit an act of oral copulation against [C.G.'s] will." He is mistaken.

In addressing whether there is sufficient evidence to support Garrett's convictions, we view the entire record in the light most favorable to the judgment and presume in

17

support of the judgment the existence of every fact that the jury reasonably could deduce from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Golde* (2008) 163 Cal.App.4th 101, 108.)

Viewed in the light most favorable to the judgment, the evidence shows that on the night in question, C.G. was forced to orally copulate four men in a public restroom. Thereafter, the same four men stood over her masturbating, and at least three of them ejaculated on her.  Garrett's DNA was found in samples taken from C.G.'s left arm, back, and clothing on the night in question.  Moreover, Garrett was one of three of the men who waited outside C.G.'s apartment when Hamilton picked her up and then reconvened, along with C.G., at a nearby park.  While C.G. was in the restroom being assaulted, Garrett was either inside the restroom or at a table just outside.

On this record, a jury reasonably could conclude that Garrett forced C.G. to orally copulate him, and that he intended to and did aid and the other men in forcing C.G. to do the same to them.  Even assuming Garrett was the last man to enter the restroom, the jury reasonably could conclude that his presence at the table just outside the restroom aided the others by, among other things, deterring C.G. from attempting to flee.

Garrett's convictions for forcible oral copulation and forcible oral copulation in concert are supported by substantial evidence.

V

Defendant's Failure to Object to Evidence That C.G. Offered to Take a Polygraph Test Forfeited the Issue on Appeal, and In Any Event, the Admission of Such Evidence Was Harmless

Garrett next contends "[t]he judgment should be reversed to remedy [the jury's] erroneous exposure to evidence that [C.G.] offered to take a polygraph test."  We are not persuaded.

During his cross-examination of C.G., Hamilton's trial counsel stated to C.G., "In fact, you wanted to take a lie detector test" when Officer Willover indicated that he did

not believe her when she said that she did not know Hamilton from the incident in the restroom, and C.G. responded, "Yeah." Garrett did not object to the questioning or request an admonition or curative instruction.

In *People v. Leonard* (2007) 40 Cal.4th 1370, 1408, our Supreme Court found that "[a]lthough the portion of defendant's statement in which he refused to take the [polygraph] test was subject to exclusion upon proper objection (Evid. Code, § 351.1), the defense did not object, and the prosecutor was free to comment on it once it was admitted into evidence."[6]

Here, Garrett forfeited his challenge to the admission of evidence C.G. wanted to take a polygraph test by failing to object to the questioning or request an admonition or curative instruction. (*People v. Leonard, supra,* 40 Cal.4th at p. 1408.) Even assuming for argument's sake that the issue was preserved on appeal, the passing reference to C.G.'s desire to take a polygraph test was harmless. Garrett acknowledges that C.G.'s desire to take a polygraph test was not mentioned during closing arguments. Moreover, C.G. wanted to take a polygraph test to establish her credibility concerning an issue that had little, if any, bearing on Garrett's guilt -- whether she recognized *Hamilton* from the restroom incident. Under these circumstances, we find the passing reference to C.G.'s desire to take a polygraph test was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

---

[6] Evidence Code section 351.1, subdivision (a) provides in pertinent part: "Notwithstanding any other provision of law, . . . any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, . . . unless all parties stipulate to the admission of such results."

# VI

## The Jury Was Properly Instructed with CALCRIM No. 400

The trial court instructed the jury in the language of CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways: [¶] One, he or she may have directly committed the crime. I would call that person the perpetrator. [¶] Two, he or she may have aided and abetted the perpetrator who directly committed the crime. [¶] *A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.*" (Italics added.) Garrett contends the trial court erred in so instructing the jury because the italicized portion of the instruction "suggests that an aider and abettor is vicariously responsible for the intent as well as the acts of the perpetrator and is equally guilty with the direct perpetrator." He further asserts that the error was exacerbated by the prosecutor's statement that an aider and abettor is "just as guilty as" the perpetrator. Again, we are not persuaded.

Garrett bases his contentions on *People v. Nero* (2010) 181 Cal.App.4th 504, 514 (*Nero*), which found that an aider and abettor can be found guilty of a crime lesser than the crime committed by the perpetrator, and thus, an earlier version of CALCRIM No. 400 that stated that " ' "[a] person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it" ' " was misleading. (*Nero, supra,* at p. 517.)

The word "equally" has since been removed from CALCRIM No. 400, which now reads in pertinent part: "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." The jury in this case was instructed with the current version of CALCRIM No. 400. Even assuming, as Garrett claims, that, as amended, CALCRIM No. 400 could be interpreted as suggesting that an aider and abettor is vicariously responsible for the intent and the acts of the direct perpetrator and are equally guilty as the direct perpetrator, we find there is no chance the jury was misled

here.  Reviewing the instructions as a whole, as we must (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220), we find no "reasonable likelihood that the instruction [on aider and abettor liability] caused the jury to misconstrue or misapply the law." (*People v. Thornton* (2007) 41 Cal.4th 391, 436).

Immediately after instructing the jury in the language of CALCRIM No. 400, the trial court instructed the jury in the language of CALCRIM No. 401 as follows:  "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] One, the perpetrator committed the crime.  [¶] Two, the defendant knew . . . the perpetrator intended to commit the crime; and [¶] Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing that crime; and [¶] Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."  The additional instructions clarified any possible ambiguity concerning the intent required for Garrett to be convicted as an aider and abettor.  In particular, CALCRIM No. 401 ensured that the jury understood that to find Garrett guilty as an aider and abettor, they had to conclude that he knew Hamilton and the other men intended to force C.G. to orally copulate them and that Garrett himself intended to aid and abet in the commission of those forcible oral copulations.[7] Accordingly, the trial court properly instructed the jury on aider and abettor liability.

Moreover, we reject Garrett's claim that the prosecutor misstated the law on aiding and abetting liability during his closing and rebuttal arguments.  During his closing

---

[7]   Because we conclude the jury was properly instructed with CALCRIM No. 400, we need not consider Garrett's claim that his trial counsel was ineffective in failing to object to the giving of that instruction.

21

and rebuttal arguments, the prosecutor told the jury that an aider and abettor is "just as guilty as" a direct perpetrator. In each case, however, the prosecutor went on to explain that someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. Thus, when considered in context, there is no reasonable likelihood the jury understood the prosecutor's remarks as stating that an aider and abettor is vicariously responsible for the intent as well as the acts of the perpetrator and is equally guilty with the direct perpetrator, as Garrett claims. Furthermore, the trial court instructed the jury to "follow the law as I explain it to you" and "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions," and we assume the jury followed the instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

VII

The DNA Evidence Is Not Unreliable

Garrett also claims that the judgment must be reversed because "it rests on unreliable DNA evidence." As we shall explain, there is no evidence to support Garrett's charge.

The prosecution's DNA expert Angelynn Shaw testified that Garrett's DNA profile was found in five different areas on C.G.'s body and clothing, namely her tank top, left arm, back, and two stains on her jeans. Garrett's DNA profile was estimated to occur at random in one in one sextillion of the African-American population; one in one hundred sextillion of the Caucasian population; and one in two hundred and seventy sextillion of the Hispanic population.

Defense expert Nikki Sewell, a colleague of Shaw's, reviewed Shaw's findings and obtained the same profiles for Garrett and Hamilton. Sewell did not disagree with any of Shaw's findings pertaining to Garrett, including Shaw's findings that Garrett's

22

DNA profile matched the DNA samples taken from C.G. Sewell did, however, disagree that Hamilton's profile included a tri-allele in the form of a 24 at location D2. Sewell noted that tri-alleles are difficult to diagnose and subject to interpretation by the analyst within lab guidelines. Sewell determined that the 24 at location D2 was high stutter, while Shaw analyzed it as a tri-allele. Sewell did not think either interpretation was incorrect because lab protocol granted leeway as to whether to analyze the 24 at location D2 as high stutter or an actual allele peak. Sewell's determination that the 24 at location D2 was high stutter as opposed to a tri-allele does not in any way undermine Shaw's findings concerning Garrett's DNA profile, with which Sewell agreed.

There is no evidence to support Garrett's charge that the DNA evidence upon which his convictions are based is unreliable.

VIII

Garrett's Trial Counsel Was Not Ineffective for Failing to Move for a Separate Trial or Jury

Finally, Garrett contends that his trial counsel provided ineffective assistance by failing "to move for a separate trial or separate jury to avoid jury exposure to the recordings of Hamilton's hearsay statements." According to Garrett, the "[j]oint trial resulted in the jury . . . hearing Hamilton's hearsay statements to detectives and statements during jail telephone calls making false denials and admissions related to this case, as well as nasty, inflammatory, derogatory expletive-laced comments by Hamilton and paramour Jasmine Hall regarding [C.G.]" As we shall explain, it was not reasonably probable that a different outcome would have ensued absent the alleged error.

Officer Willover interviewed Hamilton while he was in custody. During the interview, Hamilton identified C.G. from a photograph and acknowledged that he knew her. He said they were close friends and had consensual sex one year earlier. He repeatedly denied engaging in any nonconsensual sexual act with C.G. or engaging in any sexual act with C.G. when she was a minor. He also denied ever going by the name

23

"Chris." He said C.G. was lying if she accused him of forcible sexual conduct with her. He did not recall an incident in a park restroom with C.G. but said that if such an incident did occur it was consensual.

After being interviewed by Officer Willover, Hamilton telephoned his girlfriend and prevailed upon her to make a three-way call to C.G. Before doing so, Hamilton told his girlfriend that C.G. had accused him of raping her, and both he and his girlfriend repeatedly referred to C.G. as a "bitch." During the three-way call with C.G., Hamilton told C.G. that the police told him that she had accused him of rape, and C.G. denied making such an accusation. C.G. told Hamilton that he and "three other dudes" took her to a park "and you all had me give you ass and then you all left me up there." Hamilton said that he did not remember any such incident. C.G. told Hamilton that the incident occurred in the summer of 2000. Hamilton said he recalled going to the movie with Cameo but that was it. C.G. told Hamilton that she knew him as "Chris" but did not associate him with the incident in the restroom until recently. C.G. also said that she did not know how Hamilton could not remember the incident and explained, "It done messed me up share." Hamilton asked if he forced her to do anything, and C.G. responded that she did not want to do it.

To prevail on his ineffective assistance of counsel claim, defendant must show his counsel's representation fell below an objective standard of reasonableness and, but for counsel's error, there is a reasonable probability of a more favorable outcome. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L. Ed. 2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.) Where, as here, a claim of ineffective assistance of counsel is based on trial counsel's failure to make a motion or objection, the defendant must demonstrate not only the absence of a tactical reason for the omission, but also that the motion or objection would have been meritorious if the defendant is to bear his burden of demonstrating that it is reasonably probable that absent the omission a determination more favorable to defendant would have resulted. (*People*

24

*v. Fosselman* (1983) 33 Cal.3d 572, 584; *Strickland v. Washington*, *supra*, 466 U.S. at p. 696 [80 L.Ed.2d at p. 699].)

Here, Garrett makes no attempt to establish that a motion for a separate trial or separate jury would have been meritorious. Thus, he has failed to meet his burden of demonstrating it is reasonably probable that absent the omission a determination more favorable to him would have resulted.

Even assuming one of the motions would have been granted, the state of the evidence is such that it is not reasonably probable that a more favorable outcome would have ensued had separate trials been held or separate juries empanelled. Garrett was not mentioned during any of the conversations. Hamilton did not admit to forcing C.G. to orally copulate him or aiding and abetting anyone else in doing so. To the contrary, he denied ever forcing C.G. to do anything and said that while he did not remember any incident in a park restroom, if such an incident did occur, it was consensual. Hamilton admitted going to a movie with Cameo during the relevant time period, thereby suggesting that he was the person C.G. knew as Chris. However, his admission did not implicate Garrett in any way. C.G.'s statements to Hamilton were consistent with her testimony at trial. As the prosecutor told the jury, "what you can do is you can listen to those calls and see how they corroborate, how they give support, how they line up really with what [C.G.] testified to when she was in court." C.G.'s statements to her mother, brother's girlfriend, Johnson, and Miyamoto were also consistent with her statements to Hamilton, i.e., that she was forced to orally copulate four men in a park restroom.

We conclude that where, as here, Hamilton's incriminating statements do not implicate Garrett in the crimes charged, C.G.'s statements are merely cumulative, and the properly admitted evidence (namely the presence of Garrett's DNA on five places on C.G.'s body and clothing) is overwhelming, it is not reasonably probable that a different outcome would have ensued absent the alleged error.

Accordingly, Garrett has failed to meet his burden of establishing that his trial counsel rendered ineffective assistance.

## DISPOSITION

Hamilton's sentence on count one (forcible oral copulation) is stayed pursuant to section 654. The judgments are affirmed in all other respects. The trial court is directed to prepare and amended abstract of judgment consistent with this opinion and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.


    BLEASE    , Acting P. J.


We concur:


    NICHOLSON    , J.


    HOCH    , J.